UNITED STATES DISTRICT COURT                    b
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| **KAREN CRAWFORD** | **CIVIL ACTION NO. 1:15-CV-02383** |
| **VERSUS** | **JUDGE TRIMBLE** |
| **CAROLYN W. COLVIN** ET AL | **MAGISTRATE JUDGE PEREZ-MONTES** |

## REPORT AND RECOMMENDATION

### I.    Background

#### A.    Procedural Background

Karen Sue Crawford ("Crawford") filed an application for disability insurance benefits ("DIB") on March 19, 2013, alleging a disability onset date of December 14, 2011[1] (Doc. 10-1, p. 121/617), due to chronic lung disease, asthma, chronic bronchitis, diabetes, HTN, depression, and anxiety (Doc. 10-1, p. 156/617). That application was denied by the Social Security Administration ("SSA") (Doc. 10-1, p. 68/617).

A de novo hearing was held before an administrative law judge ("ALJ") on January 7, 2014, at which Crawford appeared with her attorney and a vocational expert (Doc. 10-1, p. 29/617). The ALJ found that Crawford last met the insured status requirements for DIB on December 31, 2011 (Doc. 10-1, p. 17/617). The ALJ found that, although Crawford had a severe impairment, bronchitis, on December 31, 2011 (Doc. 10-1, p. 17/617), she had the residual functional capacity to perform light work except that she had to avoid exposure to pulmonary irritants, dust, fumes,

---

[1] Crawford originally alleged February 1, 2006 as the onset date, but amended it to December 14, 2011 at her administrative hearing.

gases, cleaning fluids, and extreme wet or cold conditions (Doc. 10-1, p. 19/617).  The ALJ found that, as of December 31, 2011, Crawford could do her past relevant work as an insurance clerk/general clerk, credit clerk/cashier, and secretary/brokerage II clerk (Doc. 10-1, p. 23/617).  The ALJ concluded that Crawford was not disabled, as defined in the Social Security Act, at any time from February 1, 2006 through December 31, 2011 (Doc. 10-1, p. 23/617).

Crawford requested a review of the ALJ's decision, but the Appeals Council declined to review it (Doc 10-1, p. 5/617).  The ALJ's decision became the final decision of the Commission of Social Security ("the Commissioner").

Crawford next filed this appeal for judicial review of the Commissioner's final decision.  Crawford raises the following issues for review on appeal:

1. The ALJ's finding that Crawford could return to her past relevant work did not take into consideration all of the limitations contained in the residual functional capacity assessment used as a basis to deny this claim.

2. The ALJ erred in failing to find that Crawford's impairments met and/or equaled Listings 3.02 and 3.03.

3. The ALJ committed reversible error by failing to obtain an updated medical expert opinion regarding equivalency as required by SSR 96-8p.

**B.    Summary of Pertinent Facts**

   **1.    Medical Records**

In May 2005, Crawford was treated by Dr. Michael G. Buck, a family medicine doctor, for asthma exacerbation/bronchitis (Doc. 10-1, p. 417, 418/617).  Five days later, Crawford reported she still had the cough, although the fever was gone (Doc.

10-1, p. 418/617).  Crawford was diagnosed with asthma and bronchitis (Doc. 10-1, p. 419/617).

In December 2005, Crawford complained of onset cough, congestion, and wheezing; she had faint expiratory wheezes, but no rales or rhonchi (Doc. 10-1, p. 414/617).  Dr. Buck diagnosed acute bronchitis and RAD (reactive airways disease), and prescribed a Ketek pack, Tussionex, Prednisone, and Xopenex treatments (Doc. 10-1, p. 414/617).

In January 2006, Crawford again complained of asthma and bronchitis but only had slight nasal congestion (Doc. 10-1, p. 413/617).  Dr. Buck noted that Crawford had a chest x-ray in January that was unremarkable (Doc. 10-1, p. 413/617).

In February 2006, Dr. Maan Younes, a pulmonologist, evaluated Crawford (Doc. 10-1, p. 345/617).  Crawford complained of five episodes of bronchitis in 2005 that were all associated with asthma exacerbations, and a persistent cough that was severe, distressing, and productive (Doc. 10-1, p. 345/617).  Crawford reported having asthma ten to fifteen years (no hospitalizations), wheezing with her episodes of bronchitis, dyspnea on exertion (but she could walk a mile), heartburn controlled with Nexium, and chronic sinus drainage congestion (Doc. 10-1, p. 345/617).  Crawford reported that every episode of bronchitis started with a sinus infection, and that changes in weather worsened her symptoms (Doc. 10-1, p. 345/617).  An x-ray showed no acute infiltrate, and she had prolonged expirations (Doc. 10-1, p. 346/617).  Dr. Younes diagnosed asthmatic bronchitis with recurrent asthma exacerbations, sinusitis with associated bronchial infections, and a history of hypertension (Doc. 10-

3

1, p. 346/617).  Dr. Younes prescribed Prednisone for her cough, Advair, Albuterol, and nebulized breathing treatments (Doc. 10-1, p. 346/617).

In April and November 2006, and April 2007, Crawford's lungs were clear, without rales, rhonchi, or wheezing (Doc. 10-1, pp. 408, 411-412/617).

In June 2007, Crawford's lungs had wheezes bilaterally with decreased breath sounds and a prolonged expiratory phase, and she was diagnosed with a viral upper respiratory tract with reactive airway disease (Doc. 10-1, p. 407/617).  Dr. Buck prescribed a Medrol Dosepak, a Z-Pak, Poly Hist Forte, Marcof, Advair, and Albuterol (Doc. 10-1, p. 407/617).  The same problems continued through September 2007, and she was again prescribed a Z-Pak, a Medrol Dosepak, Symbicort, and Darvocet (Doc. 10-1, p. 406/617).  However, in November 2007, Crawford's lungs were clear although her asthma had been flaring up recently (Doc. 10-1, pp. 404-05/617).

A chest x-ray in November 2007 showed some chronic changes in Crawford's lower lung fields (Doc. 10-1, p. 460/617).  An x-ray in 2008 showed old chronic changes in the lower lung fields, but no acute changes (Doc. 10-1, p. 446/617).  A 2009 x-ray was negative (Doc. 10-1, p. 441/617).

In May 2008, Crawford's lungs were clear, but she had shortness of breath, a persistent, non-productive cough, insomnia, and anxiety (but no depression) (Doc. 10-1, pp. 402-03/617).

In November 2008, Crawford had congestion, coughing, croupiness, and a flare-up of asthma (Doc. 10-1, p. 398/416).  Crawford was diagnosed with adult croup

and viral upper respiratory infection (Doc. 10-1, p. 398/416).  Dr. Buck prescribed a Medrol Dosepak, a Z-Pak, and J-Cof DHC (Doc. 10-1, p. 398/416).

In December 2008, Crawford's lungs were clear, but her glucose was elevated (Doc. 10-1, p. 397/617).  In January 2009, Crawford's glucose was a little lower, her lungs were still clear, and metformin was prescribed (Doc. 10-1, p. 396/617).

In May 2009, Crawford's lungs had decreased breath sounds bilaterally and occasional expiratory wheezing (Doc. 10-1, p. 395/617).  Dr. Buck diagnosed acute bronchitis and asthma, and prescribed Prednisone, Levaquin, and Tussionex (Doc. 10-1, pp. 392-93, 395/617).  A week later, Dr. Buck noted that Crawford had not tolerated Levaquin well, and she had neurologic symptoms, a cough, irritation, and chest discomfort; he diagnosed persistent bronchitis and reactive airways disease (Doc. 10-1, p. 390-91, 394/617).

In July 2009, Crawford's lungs were clear and her glucose and cholesterol were elevated (Doc. 10-1, p. 387-88/617).

In November 2009, Crawford's lungs were still clear, but she complained of cough and congestion, and that her diabetes was causing persistent weakness, hypoglycemia, and irritability (Doc. 100-1, pp. 384-84/617).  In December 2009, Crawford was noted to have persistent cough and congestion following the flu (Doc. 10-1, p. 380/617).  In April 2010, Crawford's lungs were again clear and she reported that her other symptoms were improved (Doc. 10-1, p. 377/617).

In September 2010, Dr. L.M. Warshaw, Jr., an otolaryngologist, diagnosed Crawford with bronchitis and a deep cough that had already been treated with

antibiotics and cough medicine (Doc. 10-1, p. 243/617).  In October and November 2010, Crawford's lungs were clear again (Doc. 10-1, pp. 371, 374-75/617).

In July 2011, Crawford complained of persistent cough, sinus congestion, and wheezing lasting for one month (Doc. 10-1, p. 368/617).  Crawford had faint expiratory wheezes and was prescribed Azithromycin (Doc. 10-1, pp. 367-68/617).  Later in July 2011, Crawford was diagnosed with acute bronchitis and prescribed Symbicort (Doc. 10-1, pp. 366-67/617).  In December 2011, Crawford reported sinus congestion, cough and wheezing; her lungs were clear, and she was prescribed prednisone (Doc. 10-1, p. 361/617).

In January 2012, Dr. Warshaw examined Crawford for stuffiness, pain, and popping in her ears, as well as post-nasal drip (Doc. 10-1, p. 252/617).  Dr. Warshaw diagnosed acute sinusitis and prescribed Augmentin, Mucinex, Phenergan, and Fiorinal (Doc. 10-1, pp. 253-54/617).  Crawford also complained of sinus congestion to Dr. Buck, who found her lungs were clear but she had faint expiratory wheezes (Doc. 10-1, p. 354-55/617).  At the end of January, Crawford's lungs were clear (Doc. 10-1, p. 358/617).

In February 2012, Dr. Warshaw diagnosed acute bronchitis and bronchial pneumonia (Doc. 10-1, pp. 276, 278-79, 282, 284-86, 537, 540, 543, 547, 549/617).  Dr. Warshaw first prescribed Diflucan (Doc. 10-1, p. 176/617); then Rocephin and Celestone (Doc. 10-1, p. 283/617); Tessalon Perles and Dexilant (Doc 10-1, p. 273/617); and changed it again to Tessalon, Albuterol Sulfate, Xanax, and Bactrim (Doc. 10-1, pp. 284-86/617).  In August 2012, Dr. Warshaw treated Crawford for acute bronchitis

with wheezing and nasal congestion, prescribed Cleocin, Xopenex, and Pulmicort, and gave her injections of Celestone and Rocephin (Doc. 10-1, pp. 267-71/617).  Later in August 2012, Dr. Warshaw diagnosed acute bronchitis, cough, otalgia, and throat pain, prescribed Tessalon and Augmentin, and gave Crawford an injection of Lincocin (Doc. 10-1, pp. 164-65/617).  A week later, Dr. Warshaw found some improvement, but Crawford had a sore throat (Doc. 10-1, p. 261/617).  A chest x-ray showed stable chronic lung changes with no acute process (Doc. 10-1, p. 261/617).  Crawford was prescribed Diflucan and given a Lincocin injection for her acute bronchitis with cough and throat pain (Doc. 10-1, p. 262/617).

In August 2012, Dr. Warshaw again treated Crawford for bronchitis, cough, and throat pain (Doc. 10-1, pp. 552, 554, 560/617).

In September 2012, Crawford was evaluated for her cough and recurrent bronchitis by Dr. Maan Younes, a pulmonologist, on referral from Dr. Warshaw (Doc. 10-1, p. 333/617).  Dr. Younes found Crawford had a prolonged exhalation bilaterally, and her August 2012 chest x-ray did not show an acute process (Doc. 10-1, p. 334/617). Dr. Younes diagnosed recurrent bronchitis, asthma (moderate intermittent), hypertension, diabetes, and depression (Doc. 10-1, p. 334/617).

In October 2012, Dr. Warshaw diagnosed Crawford with acute pharyngitis, post-nasal drainage, cough, headaches, and throat pain; prescribed a gargle mix of Benadryl, Decadron, Nystatin, Fiorinal, and Bactrim; and gave Crawford injections of Celestone and Rocephin (Doc. 259-60, 563/617).  Later in October, Crawford still

had acute bronchitis with cough and post-nasal drainage, and she was given injections of Celestone and Rocephin (Doc. 10-1, pp. 256, 566/617).

In January 2013, Crawford had a cough, post-nasal drainage, acute sinusitis, otalgia, and nasal congestion, and was prescribed Augmentin, Mucinex, Phenergan, and Fiorinal (Doc. 10-1, pp. 253-254, 569/617).

In February 2013, Crawford was evaluated for post-nasal drip (Doc. 10-1, p. 571/617) and bronchitis (Doc. 10-1, p. 250/617).  X-rays did not show any significant abnormalities or significant sinus disease, and a CT scan was normal (Doc. 10-1, p. 250/617).  Dr. Warshaw prescribed Tessalon Perles (Doc. 10-1, p. 250/617).   On a follow-up visit, Dr. Warshaw noted Crawford's cough for one week, bilateral sinusitis, and post-nasal drip, and diagnosed acute bronchitis with wheezing and a cough (Doc. 10-1, pp. 244-45, 575, 577-78/617).   Dr. Warshaw prescribed Difulcan, and gave Crawford injections of Celestone and Lincocin (Doc. 10-1, p. 246, 5577-78/617).

In March 2013, Dr. Benjamin Walton, an otolaryngologist, evaluated Crawford (Doc. 10-1, p. 476/617).  Dr. Walton found atypical asthma and continued her asthma medications (Doc. 10-1, p. 476/617).

In March 2013, Dr. Warshaw continued to treat Crawford's bronchitis, constant cough, face pain, and post-nasal drip; her lungs were clear (Doc. 10-1, p. 290, 580/617).   Dr. Warshaw diagnosed acute sinusitis and post-nasal drainage, and prescribed Cipro (Doc. 10-1, p. 291/617).  In April 2013, Dr. Warshaw diagnosed a septal deviation and tracheomalacia (Doc. 10-1, pp. 288-89, 581-82/617).

Dr. Warshaw treated Crawford for cough, throat pain, reflux, and tracheomalacia in May 2013 (Doc. 10-1, p. 533, 584/617).  In June 2013, Dr. Benjamin Walton diagnosed Crawford with tracheomalacia, affecting her membranous trachea, with collapse (Doc. 10-1, p. 474/617).

On May 30, 2013, Dr. Warshaw wrote that he was treating Crawford for complication of tracheomalacia, a condition characterized by flaccidity of the tracheal support cartilage that leads to tracheal collapse, especially when increased airflow is demanded (Doc. 10-1, p. 294/617).  Dr. Warshaw wrote that complications of her condition are consistent shortness of breath and susceptibility to respiratory infections, which can be as often as once every two to three months, and of extended duration (Doc. 10-1, p. 294/617).  Dr. Warshaw noted that Crawford would be confined to home during a respiratory infection, affecting her ability to function as a reliable employee and causing excessive absenteeism (Doc. 10-1, p. 294/617).  Dr. Warshaw stated in a follow-up letter, dated November 2013, that Crawford's problems with shortness of breath, chronic wheezing, chronic cough, and increased susceptibility to respiratory infections have been evident since at least Fall 2011 (Doc. 10-1, p. 196/617).  Dr. Warshaw's records showed that, on February 1, 2012, Crawford had a two-month history of chronic cough, increased wheezing and mucous production, and that the functional restrictions he previously set forth were applicable to Crawford prior to December 31, 2011 (Doc. 10-1, p. 296/617).

In June 2013, Crawford complained of a cough and sore throat (Doc, 10-1, p. 529/617).  She was diagnosed with fatigue, nonspecific abnormal results of function

studies (thyroid), and hypothyroidism (Doc. 10-1, p. 530/617).   Thyroid function tests were ordered (Doc. 10-1, p. 530/617).   Crawford was also diagnosed with cough, asthmatic bronchitis, and shortness of breath, with fever in June and July 2013 (Doc. 10-1, pp. 523, 525/617).  By August, Crawford's condition had improved to cough, post-nasal drainage, wheezing, acute sinusitis, headaches, and throat pain (Doc. 10-1, p. 520/617).

In August and September 2013, Dr. Kenneth Brown, a family medicine doctor, treated Crawford for depressive disorder (Doc. 10-1, p. 298/617).   Crawford had anhedonia (decreased interest in work, socializing, family activities, sex, hobbies, and church), decreased appetite, hypersomnia, fatigue, and irritability, but no anxious mood, crying spells, or suicidal ideation (Doc. 10-1, p. 302/617).  Dr. Brown diagnosed depressive disorder, as well as congestion, ordered a screening for osteoporosis, and prescribed Cymbalta (Doc. 10-1, p. 304/617).   Dr. Brown noted that Crawford was diagnosed with depression fifteen years ago, was taking Cymbalta, and was currently free of symptoms, though she had an episode of depression in the past month (Doc. 10-1, p. 298/617).  Dr. Brown further noted Crawford's history of diabetes mellitus, obesity, hypertension, and tracheomalacia (Doc. 10-1, p. 298/617).   Dr. Brown continued Crawford's Cymbalta and Metformin prescriptions (Doc. 10-1, p. 300/617).

In September 2013, Dr. Warshaw treated Crawford for continued cough, headaches, acute sinusitis, throat pain, wheezing, and post-nasal drainage (Doc. 10-1, pp. 508-517/617).  Dr. Warshaw diagnosed disease of the nasal cavity and sinuses,

headaches, and chronic sinusitis, and recommended a balloon sinuplasty (Doc. 10-1, p. 506-07/617).

A balloon sinuplasty was performed on Crawford in October 2013 (Doc. 10-1, p. 503/617).  Crawford's cough returned in November 2013, but she did not have any sinus drainage (Doc. 10-1, pp. 496-97/617).  Crawford's otopharynx was inflamed with erythema, she had decreased intensity of breath sounds, and she had bilateral wheezing; she was diagnosed with cough, wheezing and acute bronchitis (Doc. 10-1, p. 497/617).   Three days later, Crawford also had bilateral sinusitis with nasal congestion (Doc. 10-1, p. 494/617).  A week later, Crawford was wheezing (Doc. 10-1, p. 491/617).  Crawford's upper respiratory infection was improved in early December 2013, but she began wheezing again in mid-December and her bronchitis returned (Doc. 10-1, pp. 480, 485, 488/617).

In early and mid- March 2014, Crawford had a productive, croupy cough; was diagnosed with acute bronchitis, cough, and throat pain; and treated with Mucinex, Phenergan, Albuterol, Pulmicort, and infections (Doc. 10-1, pp. 612, 616/617). Crawford then developed wheezing and asthmatic bronchitis (Doc. 10-1, p. 607/617). The wheezing increased and her cough became intractable, so, in mid-March, Crawford was admitted to the hospital for three days for bronchitis and COPD (Doc. 10-1, pp. 587-597, 603/617).

### 2.   Administrative Hearing

Crawford testified at her hearing that she is married and her husband is disabled (he does not require her assistance) (Doc. 10-1, p. 35/617).  Crawford has a

high school education, and has not worked since 2006, except for two months working at a daycare (Doc. 10-1, p. 36/617).  Crawford stopped working at the daycare because she was in constant contact with sick children, which made her sick (Doc. 10-1, p. 36/617).

Crawford testified that, when she worked as a Branch Office Administrator for Edward D. Jones for over six years, she was responsible for opening and closing the office, taking and making deposits, answering the phone, keeping up with the stock market, answering questions, making appointments, and cleaning the office (Doc. 10-1, pp. 36-37, 59/617).  Crawford did not supervise anyone, and worked directly under the broker (Doc. 10-1, p. 37/617).  Crawford stopped working there because she kept getting sick and missing work, and she needed to quit working to get well (Doc. 10-1, p. 37/617).  In addition, Crawford had a problem tolerating the odors of the cleaning supplies (Doc. 10-1, p. 37/617).  The heaviest thing Crawford lifted there was a case of paper that weighed about 30 or 40 pounds (Doc. 10-1, p. 38/617).

Crawford testified that she did office work at the Alexandria Furniture Outlet for about two years, making daily deposits, taking money for payments, doing general clerical work, running credit reports, and taking applications for credit (Doc. 10-1, pp. 37, 59-60/617).  The heaviest thing Crawford lifted there was a case of paper that weighed about 30 or 40 pounds (Doc. 10-1, p. 38/617).

Crawford also worked at C&W Underwriters for over two-and-a-half years, typing policies, running reports, getting quotes on apartment buildings, calculating refunds on cancellation policies, retrieving paper files, making copies of policies, and

12

going to the post office (Doc. 10-1, pp. 38, 59/617).  The heaviest thing Crawford lifted there was about 40 to 45 pounds (Doc. 10-1, pp. 38, 60/617).

Crawford testified that, in 2006, she began having difficulties with coughing and wheezing (Doc. 10-1, p. 39/617).   Crawford has had bronchial respiratory problems (asthma) her entire life, and uses an inhaler twice a day (Doc. 10-1, p. 39/617).   When Crawford gets a cold, it becomes bronchitis, and if she comes into contact with anyone that is sick, she gets sick (Doc. 10-1, p. 39/, 617).   Crawford testified that she has weak lungs, so if she starts to feel bad she immediately goes to see Dr. Warshaw and starts treatment (Doc. 10-1, p. 39/617).   Crawford had been seeing Dr. Warshaw for three years and was treated by Dr. Buck, her family doctor, before that (Doc. 10-1, p. 39/617).

When Crawford stopped working in 2006, she was having difficulty with absences from work (Doc. 10-1, p. 40/617).  Crawford was missing about one day per week (Doc. 10-1, p. 40/617).   Crawford was wheezing and coughing, and her medication made her sleepy and unable to focus (Doc. 10-1, p. 40/617).   Crawford also greeted the general public at all of her jobs, and came into contact with people when she went to the bank (Doc. 10-1, p. 52/617).

Crawford testified that her condition is made worse by perfume, cleaning supplies, and the weather (Doc. 10-1, p. 40/617).  Hot or cold weather make Crawford cough (Doc. 10-, pp. 40-41/617).  Crawford cannot be around her grandson very much because she gets sick so easily (Doc. 10-1, p. 41/617).   Since she stopped working,

Crawford does not go out of the house if the weather is bad, and she tries to avoid anyone that is sick (Doc. 10-1, p. 41/617).

Crawford testified that steroids make her blood sugar go up (Doc. 10-1, p. 41/617).  Crawford does breathing treatments two or three times per day, for 15 to 20 minutes each (Doc. 10-1, p. 41/617).  Crawford uses her inhaler daily, but usually only does the breathing treatments when she is ill (Doc. 10-1, p. 42/617).   Crawford testified that she only stays well for about a month at a time, which is very depressing (Doc. 10-1. P. 41/617).

Crawford testified that she uses a Ventolin inhaler if she has an asthma attack (about three times per week) and uses a Symbicort inhaler every day (Doc. 10-1, pp. 43-44/617).  Crawford also takes Mucinex once a day, Singulair once a day, Losartan once a day for high blood pressure, Metformin for diabetes, Cymbalta for depression, Premarin (hormones), Prevacid for GERD, Cytomel for her underactive thyroid, and Xanax about once a day (Doc. 10-1, pp. 43-44/617).

Crawford has suffered from depression for about 15 years (Doc. 10-1, p. 55/617). When she is depressed, Crawford does not want to get out of bed, she cries, and she does not want to see or talk to anyone (Doc. 10-1, p. 45/617).  Crawford testified that she has crying spells once or twice a week when she is sick (Doc. 10-1, p. 46/617). Crawford avoids people because of depression and bronchitis (Doc. 10-1, p. 46/617).

Crawford's husband does most of the grocery shopping but she goes with him sometimes (Doc. 10-1, pp. 46-47, 50-51/617).  Crawford goes to church when she is not sick (about once a month) (Doc. 10-1, pp. 46-47, 50-51/617).  Crawford stopped driving

two to three years before the hearing because some of her medication makes her dizzy (Doc. 10-1, pp. 46-47, 50-51/617).  When she is well, Crawford does housework such as vacuuming, laundry, washing dishes, and cooking (Doc. 10-1, pp. 46-47, 50-51/617). Crawford also reads a lot (Doc. 10-1, p. 47/617).

Crawford testified that steroids cause her problems sleeping, but she sleeps for a day when the steroids wear off (Doc. 10-1, p. 48/617).  Crawford is sick every four to eight weeks (Doc. 10-1, p. 51/617).  When Crawford was seeing Dr. Younes, she started on a course of Prednisone every two to three months (Doc. 10-1, p. 51/617). Crawford has a chronic cough that is a symptom of tracheomalacia (Doc. 10-1, pp. 51-52/617).  Crawford explained that, when she starts coughing, her windpipe shuts down and she loses her breath (Doc. 10-1, p. 52/617).

Crawford also sees pulmonary specialists, Dr. Younes and Dr. Walton (Doc. 10-1, p. 48.617).  Dr. Walton performed a bronchial scope and found that she has tracheomalacia,[2] which is a condition of the windpipe (Doc. 10-1, p. 48/617).  Dr. Kenneth Brown is Crawford's primary care doctor.  Dr. Benjamin Close tested her for her allergies, but she does not have any (Doc 10-1, p. 49/617).

Crawford testified that she waits two to three days before she goes to the doctor (Doc. 10-1, p. 53/617).  Crawford's symptoms begin with wheezing and coughing, and

---

[2] Tracheomalacia is a weakness and floppiness of the walls of the windpipe (trachea, or airway). Tracheomalacia may be congenital, when the windpipe has not developed properly.  MEDLINEplus Health Information, Medical Encyclopedia:  Tacheomalacia–congenital, *available at* https://medlineplus.gov/ency/article/001084.htm (a service of the U.S. National Library of Medicine and the National Institutes of Health).  Tracheomalacia may also be acquired, and occurs when normal cartilage in the wall of the windpipe begins to break down.  **Error! Main Document Only.**MEDLINEplus Health Information, Medical Encyclopedia: Tacheomalacia–acquired, *available at* https://medlineplus.gov/ency/article/007310.htm (a service of the U.S. National Library of Medicine and the National Institutes of Health).

it takes two to three weeks to be symptom-free again (Doc. 10-1, p. 53/617).   Dr. Warshaw typically gives Crawford steroids and antibiotics (Doc. 10-1, p. 54/617). Steroids cause Crawford's blood sugar to go up (Doc. 10-1, p. 54/617).   Crawford testified that, in 2011, she spent most of November in bed due to illness (Doc. 10-1, p. 54/617).

Crawford testified that her breathing problem has been an almost lifelong problem, but that she was able to work before 2006 because she was a single mother and did not have a choice (Doc. 10-1, p. 56/617).   Crawford testified that she often worked when she was sick (Doc. 10-1, p. 55/617).

Crawford proffered her husband's testimony that her symptoms predate her date last insured (Doc. 10-1, pp. 51-52/617).

The VE testified that Crawford's past relevant work at the brokerage firm was a combination job of secretary (light, skilled, SVP 6, DOT 201.219.3030), brokerage clerk II (light semi-skilled, SVP 4, DOT 219.362-018), light housekeeping (light, unskilled, SVP 2, DOT 323.687-014) (Doc. 10-1, p. 58/617), credit clerk (sedentary, semi-skilled, SVP 4, DOT 205.367-022), general cashier (light, unskilled, SVP 2, DOT 211.462-010), insurance clerk (sedentary, semi-skilled, SVP 4, DOT 219-387-014), and general clerk (light semi-skilled, SVP 3, DOT 209.562-010) Doc. 10-1, p. 58/617). The VE further testified that, although Crawford's lifting went up into the 40 pound range, which is medium level work, that was not the majority (or average) number of times during the work week, and that was not an essential job duty as the work is performed in the national economy (Doc. 10-1, p. 58/617).

16

The VE further testified that the job of secretary (SOC 43-6014) has 1,465,810 jobs in nationally and 25,330 jobs in Louisiana.  The job of brokerage clerk has 7225 jobs nationally and 35 jobs in Louisiana (Doc. 10-1, p. 59/617).  The VE testified that Crawford had sufficient skills to do work as a secretary or a brokerage clerk, as stand-alone jobs (Doc. 10-1, p. 59/617).

The VE testified that Crawford's past work at the furniture company was a combination of credit clerk (SVP 4) and general cashier (unskilled) (Doc. 10-1, p. 60/617).  Crawford's past work at the underwriting office was a combination of general clerk and insurance clerk (Doc. 10-1,. P. 60/617).  The VE testified that Crawford had sufficient skills to work as a credit clerk, a general clerk, or an insurance clerk as a stand-alone job (Doc. 10-1, p. 60/617).

The ALJ posed a hypothetical to the VE, involving a person of Crawford's age, education, and work experience, who is able to perform light work, should avoid exposure to pulmonary irritants, dusts, fumes, gases, cleaning fluids, and extreme wet or cold.  The VE testified that such a person could do work as a brokerage clerk, secretary, credit clerk, cashier insurance clerk, or general clerk, as those jobs are performed in the national economy (Doc. 10-1, p. 61/617).

The VE testified that missing a week every other month due to illness would be excessive absenteeism that would lead to termination of employment (Doc. 10-1, p. 62/617).  The VE testified that an employer might make an exception for absenteeism for an employee that is unique, but that none of Crawford's past work is

unique (Doc. pp. 62-63/617). The VE further testified that all of the jobs listed involve contact with the general public (Doc. 10-1, p. 63/617).

At the end of the evidentiary hearing, Crawford amended her disability onset date to December 14, 2011, when she started treatment with Dr. Buck (Doc. 10-1, p. 64/617). Crawford explained that she returned to Dr. Buck in January 2012, then saw Dr. Warshaw in February 2012, describing a two-month history of difficulties. Crawford pointed out that she had six episodes of bronchitis in 12 months (Doc. 10-1, p. 64/617).

C.    **ALJ's Findings**

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Crawford (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. See Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120 (1995) (citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir. 1987)).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled. Under the regulations, this means that the claimant bears the burden

18

of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy.  See Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Crawford has not engaged in substantial gainful activity since February 1, 2006, that her disability insured status expired on December 31, 2011, and that she had a severe impairment of bronchitis (on December 31, 2011), but that she did not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Doc. 10-1, pp. 17-18/617).  The ALJ then found that, as of December 31, 2011, Crawford had the residual functional capacity to perform light work except that she had to avoid exposure to pulmonary irritants, dust, fumes, gases, cleaning fluids, and  extreme wet or cold (Doc. 10-1, p. 19/617).  The ALJ concluded that Crawford could perform her past relevant work as an insurance clerk/general clerk, credit clerk/cashier, and secretary/brokerage II clerk (Doc. 10-1, p. 23/617).  The sequential analysis thus ended at Step 4, with a finding that Crawford was not disabled (Doc. 10-1, p. 23/617).

## II.   Law and Analysis

### A.   Eligibility for DIB

To qualify for DIB, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act.  See 42 U.S.C. 416(i), 423.  Establishment of a disability is contingent upon two findings.  First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result

in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  See 42 U.S.C. 423 (d)(1)(A).  Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  See 42 U.S.C. § 423(d)(2).

**B.**    <u>**Scope of Review**</u>

In considering Social Security appeals, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors.  See <u>McQueen v. Apfel</u>, 168 F.3d 152, 157 (5th Cir. 1999).  For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance.  See <u>Falco v. Shalala</u>, 27 F.3d 160, 162 (5th Cir. 1994) (citing <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)).  Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence that support the Commissioner's decision, but must include a scrutiny of the record as a whole.  The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.  See <u>Singletary v. Bowen</u>, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  See <u>Fraga v. Bowen</u>, 810 F.2d 1296, 1302 (5th Cir. 1987); <u>Dellolio v. Heckler</u>, 705 F.2d 123, 125 (5th Cir. 1983).  The resolution of conflicting evidence and credibility choices is for

the Commissioner and the ALJ, rather than the court.  See Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981); see also Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992).  The court does have authority, however, to set aside factual findings that are not supported by substantial evidence and to correct errors of law.  See Dellolio, 705 F.2d at 125.  But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."  See Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

### C. Substantial evidence does not support the ALJ's finding that Crawford can do her past relevant work.

Crawford contends the ALJ's finding that she could return to her past relevant work did not take into consideration all of the limitations contained in the residual functional capacity assessment used as a basis to deny her claim.  Specifically, Crawford argues that all of those jobs require her to interact with the public, which brings her into contact with pulmonary irritants such as perfumes, colognes, and cigarette smoke.

A claimant's impairments may cause physical or mental limitations that affect what he can do in a work setting.  Residual functional capacity is a medical assessment, based upon all of the relevant evidence, of the work a claimant can perform despite his or her limitations.  See 20 C.F.R. §404.1545, §416.945.  Although the burden of proof in a disability case is on the claimant to show that he is unable to perform his usual line of work, once that fact is established, the burden shifts to the Commissioner to show that the claimant is able to perform some other kind of

substantial work available in the national economy.  See Herron v. Bowen, 788 F. 2d 1127, 1131 (5th Cir. 1986), and cases cited therein; see also Babineaux v. Heckler, 743 F.2d 1065, 1067 (5th Cir. 1984).  The Commissioner has the burden to establish a claimant's residual functional capacity.  See Leggett v. Chater, 67 F.3d 558, 565 (5th Cir. 1995).

For cases at the ALJ hearing level, the ALJ has the responsibility for deciding a claimant's residual functional capacity.  See 20 C.F.R. § 404.1546, § 416.946.  The ALJ must perform a "function-by-function" assessment of the claimant's ability to engage in work-related activities when making his RFC determination.  See S.S.R. 96-8p (1996 WL 374184).  S.S.R. 96-8p provides that a residual functional capacity (RFC) "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."

The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed. A vocational expert is able to compare all the unique requirements of a specified job with the particular ailments a claimant suffers in order to reach a reasoned conclusion whether the claimant can perform the specific job.  See Fields v. Bowen, 805 F.2d 1168, 1170 (5th Cir. 1986)

At the administrative hearing, Crawford explained that exposure to pulmonary irritants, such as perfume, makes her condition worse (Doc. 10-1, p. 40/617).  The VE agreed that all of the jobs he found that she is able to do (her past

relevant work) require exposure to the public.  It is not clear whether the VE thought of perfume, cologne, and cigarette smoke as pulmonary irritants.

The ALJ stated that Crawford has to avoid exposure to pulmonary irritants (Doc. 100-1, pp. 19-20/617).  The ALJ did not limit Crawford to avoiding "more than minimal" or "concentrated" exposure to pulmonary irritants; Crawford must avoid all exposure.

The ALJ did not reconcile Crawford's limitation of no exposure to pulmonary irritants with his finding that she can do jobs that expose her to the public, with its concomitant battery of colognes, perfumes, and cigarette smoke.

The record is inconclusive as to whether Crawford can perform her past relevant work and whether there are any jobs existing in sufficient numbers in the national economy that Crawford can perform, given her true impairments.  Therefore, substantial evidence does not support the ALJ's/Commissioner's finding that Crawford is not disabled.  <u>See</u> <u>Martin v. Astrue</u>, 2012 WL 1980363 (W.D. La. 2012) (adopting <u>Martin v. Astrue</u>, 2012 WL 1982098 (W.D. La. 2012) (Report and Recommendation)).  Crawford's case should be remanded for a determination as to whether there are any jobs she can do, given her functional limitations.

**D.**   <u>**Crawford's impairments do not meet Listings 3.02 or 3.03.**</u>

Next, Crawford argues the ALJ erred in failing to find that Crawford's impairments met and/or equaled Listing 3.02 and 3.03.

If the claimant's condition is listed, or is medically equivalent to a listed impairment, the claimant is conclusively determined disabled.  <u>See</u> <u>Cieutat v. Bowen</u>,

824 F.2d 348, 351 n.1 (5th Cir. 1987); see also Selders v. Sullivan, 914 F.2d 614, 619
n. 1 (5th Cir. 1990).  A claimant has the burden of proving that his condition meets
or equals an impairment listed in Appendix 1.  See Sullivan v. Zebley, 493 U.S. 521
(1990); see also Selders, 914 F. 2d at 619.  For a claimant to show that his impairment
matches a listing, it must meet all of the specified medical criteria.  An impairment
that manifests only some of those criteria, no matter how severely, does not qualify.
See Zebley, 110 S. Ct. at 891.

Crawford has not argued or shown that she meets Listing 3.02–Chronic
Pulmonary Insufficiency, which requires a record of FEV, FVC, DLCO, or arterial
blood gas values.

Instead, Crawford argues that she meets Listing 3.03–Asthma.  Listing 3.03–
Asthma provides:

> A. Chronic asthmatic bronchitis.  Evaluated under the criteria for
> chronic obstructive pulmonary disease in 3.02A;
> Or
> B. Attacks (as defined in 3.00C), in spite of prescribed treatment and
> requiring physician intervention, occurring at least once every 2
> months or at least six times a year.  Each in-patient
> hospitalization for longer than 24 hours for control of asthma
> counts as two attacks, and an evaluation period of at least 12
> consecutive months must be used to determine the frequency of
> attacks.

Listing 3.00C defines "attacks" as follows:

> Attacks of asthma, episodes of bronchitis or pneumonia or
> hemoptysis (more than blood-streaked sputum), or respiratory
> failure as referred to in paragraph B of 3.03, 3.04, or 3.07, are
> defined as prolonged symptomatic episodes lasting one or more
> days and requiring intensive treatment, such as intravenous
> bronchodilator or antibiotic administration or prolonged
> inhalational bronchodilator therapy in a hospital, emergency

24

room or equivalent setting. The medical evidence must also include information documenting adherence to a prescribed regimen of treatment as well as a description of physical signs. For asthma, the medical evidence should include spirometric results obtained between attacks that document the presence of baseline airflow obstruction.

Crawford contends she was treated 26 times for wheezing and/or acute bronchitis between December 14, 2011 and December 23, 2013, and required "medical intervention" at least 42 times during that period. Dr. Warshaw wrote in November 2013 that Crawford has had shortness of breath, chronic wheezing, chronic coughing, and increased susceptibility to respiratory infections since at least the Fall of 2011 (Doc. 10-1, p. 292/617). Crawford points out that the ALJ did not mention Dr. Warshaw's November 2013 letter.

Crawford has not shown that she had "intensive treatment" or treatment in a hospital, emergency room, or equivalent setting. Crawford's records indicate one hospitalization, in 2014. Crawford also has not provided spirometric results obtained between attacks that document the presence of baseline airflow obstruction. Therefore, Crawford has not carried her burden of proving she meets Listing 3.03.

Substantial evidence supports the ALJ's/Commissioner's finding that Crawford does not meet a listing.

### E.   The ALJ did not abuse her discretion by failing to obtain an updated medical expert opinion regarding equivalency.

Crawford contends the ALJ also committed reversible error by failing to obtain an updated medical expert opinion regarding equivalency as required by SSR 96-8p.

The ALJ has the discretion to order a consultative examination.   An examination at government expense is not required unless the record establishes that such an examination is necessary to enable the ALJ to make the disability decision. See Anderson v. Bowen, 887 F.2d 630, 634 (5th Cir. 1989); see also Brock v. Chater, 84 F.3d 726 (5th Cir. 1996); Wren v. Sullivan, 925 F.2d 123, 127 (5th Cir. 1991); Haywood v. Sullivan, 888 F.2d 1463, 1472 (5th Cir. 1989).

Nothing in the administrative record indicates a medical expert was needed to update the equivalency of Crawford's condition to the listings.   Crawford needed only to show that she met a listing before the end of 2011.

Therefore, the ALJ did not abuse her discretion in not employing a medical expert.

## III.   Conclusion

Based on the foregoing, IT IS RECOMMENDED that Crawford's appeal be GRANTED, the final decision of the Commissioner be VACATED, and Crawford's case be REMANDED to the Commissioner for further proceedings to determine whether Crawford can perform her past relevant work, and whether there are any jobs existing in sufficient numbers that Crawford can perform.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.   No other briefs (such as

supplemental objections, reply briefs, etc.) may be filed.  Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this __6th__ day of October, 2016.

Joseph H.L. Perez-Montes
United States Magistrate Judge